**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **MADY MARYLOUISE SCHUBARTH**, | |
| Plaintiff, | |
| v. | Case No. 14-cv-2140 (CRC) |
| **BODENVERWERTUNGS-UND-VERWALTUNGS GMBH**, | |
| Defendant. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Mady Marylouise Schubarth brings suit against a German state-owned entity—Bodenverwertungs- und -verwaltungs GMBH ("BVVG")—seeking compensation for the alleged expropriation of her family's estate in former East Germany.  Following two motions to dismiss and an extended period of jurisdictional discovery, the parties still dispute whether the Court may exercise subject matter jurisdiction over BVVG under the Foreign Sovereign Immunities Act's ("FSIA") waiver and expropriation exceptions, 28 U.S.C. §§ 1605(a)(1), (3).

After jurisdictional discovery stalled due to the COVID-19 pandemic and then resumed with all the difficulties associated with cross-national evidence gathering, the parties stipulated to two facts that they had identified as central to determining jurisdiction: (i) BVVG is an agent or instrumentality of Germany and (ii) BVVG is and has been engaged in activity in the United States.  Yet, despite entering into these stipulations, BVVG filed a third motion to dismiss.  It now contends that the Court lacks jurisdiction under the FSIA's expropriation exception because the seizure of the Schubarth family estate by occupying Soviet authorities in 1945 was a domestic taking and therefore not in violation of international law.  And it argues that the FSIA's waiver exception does not apply because Germany did not waive immunity in a 1956

commercial cooperation treaty with the United States, as Schubarth contends.  Rejecting

BVVG's first contention, the Court will exercise jurisdiction under the expropriation exception.

By contrast, the Court finds that the waiver exception does not apply.

## I.   Background

In 1945, the Soviet Union, which occupied eastern Germany in the wake of World War

II, seized Schubarth's family estate (the "Liebringen Estate") via the Thuringia Land Reform

Act.  Am. Compl. [ECF No. 57] ¶ 18; Pl.'s First Opp'n [ECF No. 19] at 2–3.  The seizure was

part of a wave of expropriations undertaken by the Soviet occupying authorities, and

subsequently, the East German government.  Schubarth v. Fed. Republic of Germany

("Schubarth II"), 891 F.3d 392, 395 (D.C. Cir. 2018).  In 1963, Schubarth became an American

citizen, and thereby lost her German citizenship.  Id.  Ten years later, she inherited the

Liebringen Estate from her parents, though they were not in possession of the estate at the time.

Am. Compl. ¶ 18.

Following the reunification of East and West Germany in 1990 and as part of the

"conversion of the former East German communist system into a market economy," the German

government established the *Treuhandanstalt* ("Trust Agency") to market and sell expropriated

properties, including the Liebringen Estate.  Schubarth II, 891 F.3d at 395–6; Am. Compl. ¶ 9.

The Trust Agency closed in 1994, and its responsibilities were transferred to three successor

agencies, including BVVG.  Am. Compl. ¶ 9.

In 1990, Schubarth applied to the State Agency for Open Property Issues in Thuringia

("Thuringia State Agency") for restitution of the Liebringen Estate, and she then amended her

application in 1991.  Id. ¶ 21.  The following year, the agency granted her restitution in the form

of a small physical portion of the estate but denied her claim to the remainder of the property. Id.

In 1994, Germany enacted the Compensation Act, which created a process by which "owners of expropriated property whose restitution claims were denied could apply for compensation equal to five percent of some nominal value."[1]  Id. ¶ 24.  Schubarth applied for additional compensation under that statute in 1995.  Id.  In her application, she claimed that while the Compensation Act allowed only partial compensation, the 1954 Treaty of Friendship, Commerce and Navigation between the United States and Germany ("FCN Treaty"), 7 U.S.T. 1839, entitled her to the full, fair market value of the property as of the date of expropriation. Am. Compl. ¶ 24.[2]  She noted that the FCN Treaty prohibits Germany from taking the property of U.S. citizens without providing "just compensation" in an amount "equivalent of the property taken."  Id. ¶¶ 29–30 (quoting FCN Treaty, Art. V. ¶ 4).  She also pointed to a 1957 decision of Germany's highest court, the Federal Court of Justice, which she says confirmed that the FCN Treaty was part of German domestic law and, in the case of seized property belonging to a U.S. citizen, held that Germany's obligations under the FCN Treaty trumped inconsistent domestic legislation.  Id. ¶ 22.  Moreover, the complaint alleged that in 1990 Germany's Ministry of Finance reaffirmed that "certain U.S. citizens would be fully compensated under the FCN Treaty."  Id. ¶ 23.

Schubarth's application to the Thuringia State Agency remained pending for nineteen years, until February 2014, when the agency finally recognized her as the owner of the

---

[1]  Although Schubarth's complaint is unclear on this point, the Court assumes that "five percent of some nominal value" means five percent of the fair market value of the property.

[2]  The treaty was signed in 1954 and entered into force in 1956.  See 7 U.S.T. 1839.

Liebringen Estate; acknowledged that the land had been expropriated; and proposed a compensation award of €35,279, representing 5% of the fair market value.  Id. ¶¶ 24–25.  In November 2014, Schubarth requested that the Thuringia State Agency apply to Germany's Federal Ministry of Finance for an opinion on the applicability of the FCN Treaty to her claim for compensation.  Id. ¶ 26.  Despite this request, the agency promptly finalized the award without referencing the treaty or the 1957 decision of the Federal Court of Justice.  Id. ¶ 27.

The following month, Schubarth filed suit in this Court against Germany and BVVG.[3] Schubarth claimed that "Germany and BVVG . . . were and are liable, under U.S. and international law and under the FCN Treaty as [incorporated into] German law, for the failure to provide Mrs. Schubarth full compensation for the expropriation of the Liebringen Estate."  Id. ¶ 34.  Germany and BVVG are also liable under various provisions of the German Civil Code and U.S. common law, she contended, "for their failure to provide [her] with just compensation for the taking."  Id.

This case has now been pending since 2014 and has prompted two opinions from this Court and one from the D.C. Circuit.  The Court initially granted Germany and BVVG's original motion to dismiss on the grounds that the expropriation exception was inapplicable to both defendants.  Schubarth v. Fed. Republic of Germany ("Schubarth I"), 220 F. Supp. 3d 111, 116 (D.D.C. 2016).  The Court found Schubarth had failed to allege that either party "is engaged in a commercial activity in the United States," which is a prerequisite for applying the expropriation exception in cases where the property in question is located outside the United States.  Id. (quoting 28 U.S.C. § 1605(a)(3)).

---

[3]  Schubarth also sued the state of Thuringia in German court, and that suit is still pending.  See Third Reply [ECF No. 80] at 19 n.6.

On appeal, the D.C. Circuit affirmed the Court's ruling as to Germany but reversed as to BVVG. The circuit found that while "the question is close, reading the complaint's factual allegations together and construing all reasonable inferences in Schubarth's favor, it is plausible that BVVG 'is engaged in a commercial activity in the United States,' including ongoing sales and marketing of previously expropriated land such as the Estate." Schubarth II, 891 F.3d at 395 (quoting 28 U.S.C. § 1605(a)(3)).

After remand of the case, BVVG moved anew to dismiss and Schubarth sought to amend her complaint. BVVG contended that the applicable statute of limitations barred Schubarth's claim and that she had failed to allege that BVVG was an "agency or instrumentality" of Germany—another requirement of § 1605(a)(3). Schubarth v. Fed. Republic of Germany ("Schubarth III"), No. 14-cv-2140 (CRC), 2020 WL 13065292, at *4–7 (D.D.C. Mar. 12, 2020). The Court disagreed. Id. As for Schubarth's motion, the Court allowed her to amend her complaint to add facts related to BVVG's jurisdictional arguments but not to add facts establishing jurisdiction over Germany. Id. at *9. And, finally, because Schubarth had adequately pled that BVVG was an "agency or instrumentality" of Germany and that it was "engaged in commercial activity in the United States," the Court directed the parties to conduct jurisdictional discovery to resolve those issues. Id. at *13 (explaining that the "existence of subject matter jurisdiction over BVVG under . . . the FSIA's expropriation exception turns on [those] two issues of fact").

After delays caused by the COVID-19 pandemic, Schubarth served her first round of requests for written and document discovery in March 2023. Pl.'s Third Opp'n [ECF No. 79] at 10. After some back-and-forth, including objections from BVVG's counsel to requests regarding

the location of BVVG sales and marketing agents, id., Declaration of Mark Bravin ("Bravin

Decl."), Ex. A at 3, the parties signed a stipulation that:

> (1) BVVG is and has been an agent or instrumentality of Germany (as opposed to the state itself);
>
> (2) BVVG is and has been engaged in commercial activity in the United States, both before and at the time Schubarth filed her Complaint in this matter in 2014.
>
> The parties agree and stipulate that the above factual stipulations are intended to correspond to the two factual issues on which this Court granted jurisdictional in its March 12, 2020 Opinion[.]

Joint Stip. at 1 [ECF No. 72-2].  BVVG added, however, that it "believe[d] that legal issues

remain as to whether the Court has subject matter jurisdiction." Id. at 2.  Soon thereafter, BVVG

filed the present motion to dismiss.

## II.    Legal Standards

As with the previous motions to dismiss, BVVG challenges the legal sufficiency of

Schubarth's allegations, not the underlying facts themselves.  Third Mot. Dismiss [ECF No. 77].

The Court must therefore "take the plaintiff's factual allegations as true and determine whether

they bring the case within" the exceptions to sovereign immunity invoked by the plaintiff.

Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000).  Ultimately, a

defendant carries the burden of persuading the court "that the plaintiff's allegations do not bring

its case within [the relevant] exception to immunity." Phoenix Consulting, 216 F.3d at 40 (citing

Transamerican S.S. Corp. v. Somali Democratic Republic, 767 F.2d 998, 1002 (D.C. Cir. 1985)).

"[D]ismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if

proven, would provide grounds for relief." Price v. Socialist People's Libyan Arab Jamahiriya,

294 F.3d 82, 93 (D.C. Cir. 2002).

### III.  Analysis

BVVG raises two jurisdictional bars to this Court's jurisdiction.  First, BVVG contends that the FSIA's expropriation exception does not apply because the relevant taking (the 1945 seizure of the estate from Schubarth's parents) was a "domestic taking"—*i.e.*, a taking by a foreign sovereign of its own nationals' property—and therefore not a violation of international law.  Second, BVVG contends the FSIA's waiver exception also does not confer jurisdiction because requisite conditions of the FCN Treaty's waiver provision are not satisfied.  Though the Court agrees with BVVG as to its second contention, its first claim falls short.  Because the domestic-takings rule does not apply and the parties have stipulated to the relevant jurisdictional facts, the Court may exercise jurisdiction over BVVG pursuant to the expropriation exception. The Court will start there and then return to the waiver exception.

### A.  The Expropriation Exception

First, whether this Court lacks jurisdiction because the relevant taking was a domestic taking.  Schubarth invokes the FSIA's expropriation exception, which applies to a case

> in which rights in property taken in violation of international law are in issue and . . . that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]

28 U.S.C. § 1605(a)(3).  In one of its recent pronouncements on the FSIA, the Supreme Court held that the exception's "phrase 'rights in property taken in violation of international law,' . . . incorporates the domestic takings rule," which "assumes that what a country does to property belonging to its own citizens within its own borders is not the subject of international law."  Fed. Republic of Germany v. Philipp ("Philipp II"), 592 U.S. 169, 176, 187 (2021).

BVVG waited over two-and-a-half years to file a motion based on Philipp II and now claims it deprives this Court of jurisdiction.[4]  BVVG's argument goes like this.  The operative taking occurred in September 1945, when the Soviet Union seized the property of Schubarth's parents, who were German nationals.  Third Mot. Dismiss at 6.  Because the Allied powers "assumed control of Germany's foreign affairs and treaty obligations," "a taking of the Property by the Soviet Allied occupier" constituted a domestic taking.  Id. at 7.  And per the Supreme Court's decision in Philipp II, the FSIA's expropriation exception "incorporates the domestic takings rule" and therefore does not permit suits against foreign sovereigns based on their expropriation of their own nationals' property.  592 U.S. at 187.

   *1.  The Soviet Union's 1945 Taking*

This argument falters at the second step.  BVVG has not proved that a Soviet taking of German citizens' property ought to be treated as a domestic taking.  See Phoenix Consulting, 216 F.3d at 40 ("[T]he defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity[.]").  BVVG relies principally on Clark v. Allen, a 1947 case where the Supreme Court considered whether the U.S.'s declaration of war

---

[4]  BVVG actually waited much longer than two-and-a-half years to raise this theory. Well prior to Philipp II, the law in this circuit was that an "'intrastate taking'—a foreign sovereign's taking of its own citizens' property—does not violate the international law of takings."  Philipp v. Federal Republic of Germany ("Philipp I"), 894 F.3d 406, 410 (D.C. Cir. 2018), vacated and remanded by Philipp II, 592 U.S. 169 (2021) ; see also Simon v. Republic of Hungary ("Simon I"), 812 F.3d 127, 144 (D.C. Cir. 2016), abrogated in part by Philipp II, 592 U.S. 169 (2021) ("A sovereign's expropriation of its own national's property might violate the state's own domestic laws, but it is ordinarily not a concern of international law.").  The D.C. Circuit had found, however, that intrastate takings that amounted to genocide still violated international law and therefore satisfied the FSIA's expropriation exception.  Philipp I, 894 F.3d at 410–11 (citing Simon I, 812 F.3d at 142).  It was this conclusion that the Supreme Court rejected in Philipp II.  592 U.S. at 180 ("[T]he expropriation exception is best read as referencing the international law of expropriation rather than of human rights.  We do not look to the law of genocide. . . .").

against Germany, and particularly the attendant congressional acts and foreign policy decisions, abrogated portions of the 1923 Treaty of Friendship, Commerce, and Consular Rights ("1923 FCC Treaty") between the two nations.  331 U.S. 503, 507–12 (1947).  In response to the argument that the treaty "failed to survive the war, since Germany, as a result of its defeat and the occupation by the Allies ha[d] ceased to exist as an independent national or international community," the Supreme Court found "no evidence that the political departments [] considered the collapse and surrender of Germany as putting an end" to the treaty.  Id. at 514.  In this context, the Supreme Court noted, "[t]he Allied Control Counsel [*sic*] has, indeed, assumed control of Germany's foreign affairs and treaty obligations—a policy and course of conduct by the political departments wholly consistent with the maintenance and enforcement, rather than the repudiation, of pre-existing treaties."  Id.

BVVG claims this pronouncement proves that a taking by the Soviet Union can be considered a domestic taking "as surely as if Germany had taken the Property."  Third Mot. Dismiss at 7.  This claim begs belief.  First, the Clark court did not decide, as a matter of law, that the Allied Control Council and Germany were functionally equivalent; instead, it merely noted, as a historical reality, that the council had assumed Germany's treaty obligations.  Second, and relatedly, Clark's holding reached only as far as German foreign affairs.  It said nothing about the Allies' control of Germany's domestic affairs.  Third, the historical record reflects that in 1945—when the Soviet Union adopted the Thuringia Land Reform Act that stripped Schubarth's parents of their land—the four powers in the council were pursuing diverging land reform policies in their sectors of control.  See Sagi Schaefer, *Growing Apart: Farmers and the Division of Germany, 1945–1965*, 50 CENT. EUR. HIST. 493, 497 (2017) ("[F]armers were confronted with the conflicting central-planning strategies adopted by the Soviet, British, French,

and American occupation authorities.").  Unlike the Americans, French, and (eventually) British, the Soviets undertook plans "designed to break up large estates and divide the land into rentable plots."  Id. at 498, 498 n.16.  Therefore, to the extent <u>Clark</u> implies that the Allied Control Council, as a unified entity, "became" Germany for purposes of its international affairs, that logic does not carry over to the context of domestic takings where the council members took different tacks.  Finally, BVVG's interpretation of <u>Clark</u> runs headfirst into the Thuringia State Agency's own interpretation of the events of 1945.  In its 2014 decision denying Schubarth full compensation, the agency found the Liebringen State was expropriated under the Thuringia Land Reform Act "on the basis of the sovereignty of an occupying power."  Pl.'s First Opp'n, Ex. A at 2 n.7, 5 [translation provided by Schubarth].  For these reasons, the Court rejects BVVG's claim that the Soviet Union acted as Germany when it expropriated the Liebringen Estate.[5]

At first blush, then, it might seem that the expropriation exception permits suit against the Soviet Union, but not against Germany or its instrumentality.  However, because § 1605(a)(3) uses the passive voice "to focus on the act of taking rather than on the actor involved," "the defendant-state need not be the state that took the property in violation of international law." <u>Agudas Chasidei Chabad of U.S. v. Russian Fed'n</u>, 466 F. Supp. 2d 6, 19 (D.D.C. 2006), <u>aff'd in part and vacated and rev'd in part on other grounds</u>, 528 F.3d 934 (D.C. Cir. 2008).  Sitting *en*

---

[5]  Alternatively, BVVG may mean to argue that (i) the Soviet Union acted as itself (and not under the guise of German sovereignty) when it enacted the Thuringia Land Reform Act and yet (ii) the taking of German citizens' property still constituted a "domestic" act.  That argument would not get it far.  A taking falls within the domestic-takings rule when a sovereign expropriates the property of its own nationals, not when it expropriates the property of non-citizen residents.  <u>See</u> <u>Simon v. Republic of Hungary</u> ("<u>Simon III</u>"), 77 F.4th 1077, 1095 (D.C. Cir. 2023) (explaining that post-<u>Philipp II</u> the appropriate framework is: "Was the victim of the alleged taking a national of the foreign-state defendant at the time of the taking?  If yes, the domestic-takings rule bars application of the FSIA's expropriation exception; if no, that bar is inapplicable.").

*banc*, the Ninth Circuit held that the expropriation exception confers jurisdiction over the state and the state instrumentality with current ownership of expropriated property even if that state did not commit the underlying taking.  Cassiser v. Kingdom of Spain, 616 F.3d 1019, 1022, 1028 (9th Cir. 2010) (en banc) (pursuant to § 1605(a)(3) an American plaintiff could sue Spain and the Thyssen–Bornemisza Collection Foundation, an instrumentality of the Spanish state that owned a painting confiscated by the Nazi government); see also Joint Stip. at 1 (agreeing that "BVVG is and has been an agent or instrumentality of Germany").[6]

Accordingly, the domestic-takings rule does not prevent this Court from exercising subject matter jurisdiction pursuant to the expropriation exception.  And because the parties stipulated to the outstanding factual prerequisites to the exception—that BVVG is Germany's agent or instrumentality and has been engaged in commercial activity in the U.S.—the Court will assert jurisdiction.  See Joint Stip. at 1; see also Schubarth III, 2020 WL 13065292, at *13 ("The existence of subject matter jurisdiction over BVVG under . . . the FSIA's expropriation exception turns on two issues of fact: whether BVVG is an 'agency or instrumentality' of Germany . . . and whether BVVG 'is engaged in commercial activity in the United States.'").

### 2.  Post-1945 Compensation Rulings

The underlying premise of BVVG's domestic-takings argument is that the only taking in this case occurred in 1945.  Now that the Court has concluded that the 1945 seizure was not a

---

[6]  In Philipp II, the Supreme Court had occasion to analyze the word "taken" in the expropriation exception and did note that it "would not place so much weight on a gerund."  592 U.S. at 181.  But the Supreme Court was reacting to respondents' argument that the "distinction between 'takings' [what respondents suggested Congress might have used instead] and 'taken' . . . is the difference between incorporating the specific international law governing takings of property and incorporating international law writ large."  Id.  This Court's reading of "taken," in accordance with that of another court in this district and the Ninth Circuit, does not require the word to carry so much weight.

domestic taking, and therefore can support jurisdiction through the expropriation exception, it need not decide whether, as Schubarth alleges, Germany's subsequent failures to adequately compensate her constituted further expropriations.  The parties' briefing on this issue is less than fulsome.  But in the interest of efficiency and in anticipation of another appeal, the Court will reach the question and finds that BVVG has the better argument.

At the outset, Schubarth claims the Court already resolved this issue.  See Pl.'s Third Opp'n at 23–24.  It did not.  The Court's prior holding that Schubarth's claims were not time barred addressed a related but separate issue.  To cast Schubarth's claims as barred by the applicable fifteen-year statute of limitations, BVVG claimed that "the only expropriation that counts occurred in 1945, when the estate was seized by the Soviet Union."  Schubarth III, 2020 WL 13065292, at *4.  Alternatively, BVVG posited that "if Germany's 1992 denial of full restitution for the property also constituted an expropriation, then the limitations period expired in 2007, seven years before Schubarth filed suit."  Id.  The Court disagreed with BVVG's conclusion as to the limitations period, finding that "if a plaintiff seeks compensation through a sovereign defendant's domestic process, the plaintiff's claim does not accrue until the claim is denied—so long as [she] [] plausibly allege[s]," as Schubarth did, "that the domestic process could have provided relief."  Id.; see also id. ("When a case involves a basic international-law expropriation claim asserting a taking of a foreign national's property without payment of just compensation, there may be no violation until the plaintiff seeks (and is denied) compensation through the sovereign defendant's domestic laws." (quoting Simon I, 812 F.3d at 148)).[7]  This

---

[7]  BVVG claims subsequent D.C. Circuit cases have undercut this part of Simon I's holding, which "hinged on the possible existence of a requirement for exhaustion."  Third Reply at 8.  What BVVG overlooks is that Simon I considered three theories of exhaustion.  The panel included the above-quoted language as part of its second theory—namely that, for "basic international-law expropriation claim[s]," "exhaustion may be required before an expropriation

holding thus addressed when Schubarth's claim *accrued*, not when the underlying violation occurred.

That leaves the question:  Did the Thuringia State Agency's denials of full compensation in 1992 and 2014 constitute violations of international law?  Though the parties do not fully grapple with the question, the Court sees two ways to approach it, both of which yield the answer no.  The first is whether the compensation rulings were renewed takings; the second is whether they constituted independent violations of international law.

As for the renewed takings theory, in <u>Agudas Chasidei Chabad of U.S. v. Russian Federation</u>, the D.C. Circuit explained that a sovereign could commit a second or "renew[ed]" taking of property that had previously been expropriated by a different sovereign.  528 F.3d 934,

---

gives rise to a violation of international law."  <u>Simon I</u>, 812 F.3d at 148.  As its third theory, <u>Simon I</u> floated whether "court[s] [] should decline to exercise jurisdiction as a matter of international comity unless the plaintiffs first exhaust domestic remedies."  <u>Id.</u> at 149.  The circuit remanded the case to the district court to consider this "third form of exhaustion argument," <u>id.</u>, and it is this theory that subsequent circuit panels rejected, <u>see, e.g.</u>, <u>Simon v. Republic of Hungary</u> ("<u>Simon II</u>"), 911 F.3d 1172, 1180 (D.C. Cir. 2018), <u>vacated and remanded</u>, 592 U.S. 207 (2021) (rejecting Hungary's argument that plaintiffs "were required as a matter of international comity to first 'exhaust' or 'prudential[ly] exhaust[ ]' their claims in the Hungarian courts" (cleaned up)); <u>De Csepel v. Republic of Hungary</u>, 27 F.4th 736, 753 (D.C. Cir. 2022), <u>cert. denied sub nom.</u> <u>Museum of Fine Arts v. Csepel</u>, 143 S. Ct. 630 (2023) ("We reaffirm our holdings and rationales . . . that the FSIA does not require prudential exhaustion in suits against foreign states.").  Subsequent panels have also reinforced <u>Simon I</u>'s rejection of the "[f]irst" theory of exhaustion—*i.e.*, its holding that "the FSIA itself [does not] obligate[] a plaintiff to exhaust domestic remedies before attempting to bring suit against a foreign sovereign in United States courts."  812 F.3d at 148; <u>see also</u> <u>Simon II</u>, 911 F.3d at 1181; <u>De Csepel</u>, 27 F.4th at 753.  But the circuit has not rejected <u>Simon I</u>'s second theory.  Though the Supreme Court has clarified that as a matter of Fifth Amendment doctrine, "a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it," <u>Knick v. Twp. of Scott, Pennsylvania</u>, 588 U.S. 180, 189 (2019), the FSIA's expropriation exception is not pegged to U.S. law, <u>see</u> <u>Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse</u>, 999 F.3d 808, 821 (2d Cir. 2021) ("The expropriation exception is concerned only with illegal takings.  And the legal standards by which takings are judged are not found in the domestic laws of the United States or even the laws of the 'expropriating' nation, but rather in customary international law.").

944 (D.C. Cir. 2008), abrogated on other grounds by Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co., 581 U.S. 170 (2017).  But the court suggested that such a renewed taking occurs only if, prior to the second expropriation, the victim (i) "recover[s] *possession*" of the property or (ii) receives "a final court decree . . . , subject to no *lawful* appeal, . . . invalidating [the] prior taking."  Id.

Schubarth's complaint does not satisfy this theory.  She never regained possession of the portion of her estate now in dispute, nor did she receive a final court decree invalidating the 1945 taking.  The 2014 Thuringia State Agency decision did find that the estate had been "expropriated from" Schubarth's mother "on the basis of the sovereignty of an occupying power."  Pl.'s First Opp'n, Ex. A at 2 n.7, 5.  But the decision was not a "final court decree." Indeed, Schubarth was able to take "[l]egal action against" the decision before the administrative court in Gera, Germany.  See id. at 9; see also Caroline Dostal et. al., *Between Individual Justice and Mass Claims Proceedings: Property Restitution for Victims of Nazi Persecution in Post-Reunification Germany*, 15 GERMAN L.J. 1035, 1064 (2014) (explaining that for related compensation claims, "[o]nce all administrative remedies are exhausted," "parties are entitled to file administrative court proceedings . . . against decisions of the relevant department").  And, even more fatally, Schubarth does not allege that any taking—*e.g.*, a "frustration of [her] efforts at physical recovery"—occurred after the 2014 decision.  See Agudas, 528 F.3d at 944 ("In this country, . . . if a property owner secured a judgment invalidating a prior taking, affirmed by the highest court having jurisdiction, we would likely see executive officials' later assertion of ownership, and their frustration of the owner's efforts at physical recovery, as very much like a retaking of the property.").  Thus, Germany's compensation rulings in 1992 or 2014 did not constitute renewed takings.

Nor does it appear that the rulings violated international law on some other theory.  One of the "well-recognized . . . purposes of the FSIA" was to "codif[y] [] international law" as it existed "at the time of the FSIA's enactment" in 1976.  Permanent Mission of India to the United Nations v. City of New York, 551 U.S. 193, 199 (2007).  As a reference guide for the state of international law in 1976, the Supreme Court has relied on the Restatement (Second) of the Foreign Relations Law of the United States (Am. Law. Inst. 1965) ("Second Restatement")— "[t]he most recent restatement of foreign relations law at the time of the FSIA's enactment."  Id. at 200.  As relevant here, the Second Restatement provides that "[f]ailure of a state to pay just compensation for taking the property of an alien is wrongful under international law, regardless of whether the taking itself was wrongful under international law."  Second Restatement § 186; see also Simon I, 812 F.3d at 144 (defining the "basic international-law prohibition against uncompensated takings" with reference to § 186 of the Second Restatement).  In other words, under § 186, a failure to pay just compensation can constitute a violation of international law separate from an original taking.  See also Second Restatement § 186 cmt. a ("If the [original] taking was wrongful under international law, the failure to pay constitutes a second violation of international law."); see also Permanent Mission of India to the United Nations, 551 U.S. at 200 (citing to the commentary of the Second Restatement).

But there are reasons to doubt § 186 applies here.  Unlike the text of the FSIA's expropriation exception, § 186 employs the active voice.  Compare 28 U.S.C. § 1605(a)(3) ("in which rights in property *taken* in violation of international law are in issue" (emphasis added)) with Second Restatement § 186 ("[f]ailure of a state to pay just compensation for *taking* the property of an alien" (emphasis added)).  Thus, by its plain language, for § 186 to apply, the state that fails to compensate must also be the one that expropriated property.  Moreover, a contrary

interpretation could enable end-runs around the domestic-takings rule.  Imagine Germany had

been responsible for the original seizure of the Liebringen Estate and therefore the taking was a

domestic one.  If Schubarth could now successfully claim a violation of § 186 because in 1992

and 2014 Germany failed to pay full compensation, then a change in citizenship could convert an

expropriation seen as a "matter of domestic concern" into a violation of international law.

Philipp II, 592 U.S. at 177 (cleaned up).[8]  In sum, then, the Court finds Germany's post-1945

compensation rulings did not violate international law, either on a taking or failure-to-

compensate theory.

    B.  The Waiver Exception

With no explanation as to why it waited over seven years to raise these points, BVVG

now claims that the FCN Treaty did not waive BVVG's immunity to suit under the FSIA's

waiver exception.  Third Mot. Dismiss at 8.  Under that exception, a foreign state is not immune

from suit "in any case . . . in which the foreign state has waived its immunity either explicitly or

by implication, notwithstanding any withdrawal of the waiver which the foreign state may

purport to effect except in accordance with the terms of the waiver."  28 U.S.C. § 1605(a)(1).

Schubarth alleged that Germany waived immunity to suit in Article XVIII, Paragraph 2 of the

treaty, which provides:

> No enterprise of either Party, including corporations, associations, and
> government agencies and instrumentalities . . . shall, if it engages in commercial,
> industrial, shipping or other business activities within the territories of the other
> Party, claim or enjoy, either for itself or for its property, immunity therein from

---

[8]  Though of less relevance because it post-dated the FSIA's enactment, the Restatement (Third) of Foreign Relations Law does not suggest that a failure to compensate constitutes an independent violation.  Instead, it reflects just the standard definition of a taking.  See Restatement (Third) of Foreign Relations Law § 712 (Am. Law. Inst. 1987) ("A state is responsible under international law for injury resulting from . . . a taking by the state of the property of a national of another state that . . . is not accompanied by provision for just compensation[.]").

taxation, suit, execution of judgment or other liability to which privately owned
and controlled enterprises are subject therein.

FCN Treaty, Art. XVIII ¶ 2.  BVVG offers three theories for why this provision, via the waiver

exception, does not confer jurisdiction on this Court.  First, in a reprise of its expropriation-

exception argument, BVVG claims that the only violation of international law occurred in 1945

and the 1956 FCN Treaty does not apply retroactively to that taking.  Third Mot. Dismiss at 13–

15.  Second, BVVG claims the treaty waived immunity only to suits "based on commercial

activity," which a taking is not.  Id. at 10.  And, third, it contends the waiver "encompasses only

commercial activity engaged in by a party physically present in the United States."  Id. at 8–9.[9]

BVVG is fortunate that a party may not waive subject matter jurisdiction, see Arbaugh v. Y&H

Corp., 546 U.S. 500, 514 (2006), as the Court would otherwise find it had forfeited these

arguments.  But, given that courts "have an independent obligation to determine whether subject-

matter jurisdiction exists," id., the Court finds the waiver exception, via operation of the FCN

Treaty, does not confer jurisdiction.

> ### 1.  Retroactivity of the FCN Treaty

Because it appears that the only international-law violation occurred in 1945, the FCN

Treaty's waiver provision applies only if the 1956 treaty is retroactive.  It is not.  "Courts apply a

strong presumption against retroactive application of international treaties."  Alric v. Air France,

No. 04-cv-10295-SVW (SSx), 2006 WL 8431807, at *4 (C.D. Cal. Oct. 26, 2006).  Under

Article 28 of the Vienna Convention on the Law of Treaties, "[u]nless a different intention

---

[9]  BVVG has smuggled in yet a fourth argument, which it buries at the end of its reply
brief with little substantive analysis.  It claims that prior to the German reunification in 1990, the
FCN Treaty applied only to West Germany and West Berlin.  Third Reply at 21.  Because the
Court determines that the only violation of international law occurred in 1945, it need not reach
this issue.

appears from the treaty or is otherwise established, its provisions do not bind a party in relation to any act or fact which took place or any situation which ceased to exist before the date of the entry into force of the treaty with respect to that party."  1155 U.N.T.S. 332, 339; see also Chubb & Son, Inc. v. Asiana Airlines, 214 F.3d 301, 308 (2d Cir. 2000) (noting that even though the U.S. Senate has not ratified the Vienna Convention, it is regarded as "an authoritative codification of customary international law").  The FCN Treaty makes no mention of retroactivity.

Schubarth does not dispute this point except to note that Germany's Federal Court of Justice interpreted the treaty as superseding any "inconsistent prior" domestic legislation.  Pl.'s Third Opp'n at 40.  But the operation of domestic German law does not control whether the treaty is retroactive and therefore provides a basis for federal-court jurisdiction under the FSIA.

Thus, consistent with the strong presumption against retroactive application of treaties, the Court finds the FCN Treaty not retroactive.  And because the treaty in effect prior to the FCN Treaty—the 1923 FCC Treaty—contains no provision waiving immunity, the Court cannot assert jurisdiction under the waiver exception.  See 44 Stat. 2132.

The Court needn't go farther.  But in the event the Court of Appeals rejects the Court's assertion of jurisdiction under the expropriation exception, and its conclusion that Germany's post-1945 compensation rulings were not independent expropriations, the Court offers its views on BVVG's final two theories for why the waiver exception does not apply: commercial activity and physical presence in the United States.

### 2. Commercial Activity

Even if the FCN treaty were retroactive or Germany's post-1945 compensation rulings did violate international law, Germany (and therefore BVVG) still did not waive immunity to

this suit based on the FCN Treaty.  Though the treaty does not require a nexus between the commercial activity in the United States and the subject of the suit, as BVVG claims, see Third Mot. Dismiss at 9, the treaty waives immunity *only* for the kinds of suits a private party would be subject to—not for state expropriations of property.

First, BVVG's nexus suggestion.  "The interpretation of a treaty . . . begins with its text." Medellín v. Texas, 552 U.S. 491, 506 (2008).  Recall that the relevant part of the treaty states as follows:

> No enterprise of either Party, including corporations, associations, and government agencies and instrumentalities . . . shall, if it engages in commercial, industrial, shipping or other business activities within the territories of the other Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.

FCN Treaty, Art. XVIII ¶ 2.  As Schubarth points out, the treaty contains no textual indication that the "commercial, industrial, shipping or other business activities" BVVG conducts within the U.S. must be related to the "taxation, suit, execution of judgment or other liability" for which immunity is waived.  Id.  And when interpreting an almost identical provision of a 1955 commercial treaty between the U.S. and Iran, the Eleventh Circuit rejected a similar argument that the "waiver [provision] requires a nexus between the United States and the particular commercial activity sued upon."  Harris Corp. v. Nat'l Iranian Radio & Television, 691 F.2d 1344, 1350 (11th Cir. 1982).

But, BVVG's second suggestion fares better.  It contends that the treaty's waiver provision applies only to "suits based on commercial activity," which a taking is not.  Third Mot. Dismiss at 10.  "Generally, explicit waivers of sovereign immunity are narrowly construed in favor of the sovereign and are not enlarged beyond what the language requires."  Chang v.

<u>Republic of S. Sudan</u>, No. 21-cv-1821 (RC), 2023 WL 2351726, at *4 (D.D.C. Mar. 3, 2023) (cleaned up).  And, here, the language of the treaty contains a limiting principle.

The text indicates the parties' intent to waive immunity only for the kinds of liability "to which privately owned and controlled enterprises" would be subject.  FCN Treaty, Art. XVIII ¶ 2; <u>see also</u> <u>Sumitomo Shoji Am., Inc. v. Avagliano</u>, 457 U.S. 176, 185 (1982) ("Our role is limited to giving effect to the intent of the Treaty parties.").  To be sure, the treaty provides that the parties waive immunity to "taxation, *suit*, execution of judgment *or other liability* to which privately owned and controlled enterprises are subject therein," FCN Treaty, Art. XVIII ¶ 2 (emphasis added), and Schubarth would likely contend that the operative word for her purposes is "suit," not the long clause following liability.  But under the principle of *noscitur a sociis*—"a word is known by the company it keeps"—courts must "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words." <u>Yates v. United States</u>, 574 U.S. 528, 543 (2015) (cleaned up).  It would not make sense for the treaty parties to waive immunity to all types of "suit" but only to "liabilit[ies]" that private entities were subject to.  In this vein, one contemporary commentator explained that the immunity provision was concerned "only with establishing a rule to govern in the case of state entities that are counterparts of, and are in competition with, the enterprises to which treaty rights are accorded."  Vernon G. Setser, *The Immunity Waiver for State-Controlled Business Enterprises in United States Commercial Treaties*, Proceedings Am. Soc. Int'l L. its Ann. Meeting, Apr. 27–29, 1961, at 89, 92.  And, a taking is not the kind of liability "to which privately owned and controlled enterprises" would be subject.  Instead, a taking is an inherently sovereign act and thus does not fall within the scope of the treaty's immunity waiver.

To be sure, another provision of the FCN Treaty is concerned with takings.  Article V provides that the "[p]roperty of nationals and companies of either Party shall not be taken within the territories of the other Party, except for the public benefit and in accordance with due process of law, nor shall it be taken without just compensation."  FCN Treaty, Art. V ¶ 4.  (Indeed, Schubarth claims this provision entitles her to full compensation.  See Am. Compl. ¶ 29.)  Based on Article V, it may seem like the risk of foreign sovereigns expropriating U.S. nationals' *foreign* property animated the waiver provision.  But another limitation baked into that provision indicates that was not the case.  The treaty waives immunity for suit only *in the territory* where the foreign entity operates.  See FCN Treaty, Art. XVIII ¶ 2 (an entity operating abroad shall not "claim or enjoy, either for itself or for its property, immunity *therein* . . . ." (emphasis added)).  Thus, even if the treaty was concerned with takings (as Article V indicates), the waiver provision did not create a system where U.S. nationals could sue Germany *in the U.S.* solely based on a taking committed *in Germany*.

The overall purpose of the treaty also reflects that the waiver provision does not encompass takings.  See E. Airlines, Inc. v. Floyd, 499 U.S. 530, 535 (1991) ("[T]reaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." (cleaned up)).  The FCN Treaty was part of a wave of postwar Friendship, Commerce and Navigation Treaties that the U.S. signed.  Herman Walker Jr., *Modern Treaties of Friendship, Commerce and Navigation*, 42 MINN. L. REV. 805, 805 n.4 (1958).  When the State Department "embarked upon [this] extensive commercial treaty program, one of the most significant international facts of life . . . was the almost universal growth of state activity in the economic field."  Setser, *supra*, at 91.  Eastern European countries

"that had passed into the Soviet orbit, though not yet fully communized, were socializing industry at a rapid pace." Id. And "[e]xtensive programs of nationalization were also being pursued in Western Europe." Id. at 91–92. Against this backdrop, the U.S. wanted to avoid the scenario where foreign private enterprises established subsidiaries in the U.S., then passed into state control because of nationalization programs, and thereby shielded their subsidiaries from suit because of sovereign immunity. Id. at 92. With this concern in mind, "[p]rovision for the denial of immunity to such enterprises seemed quite pertinent to the subject matter of the proposed treaties." Id. In other words, the postwar treaties—and specifically the immunity provisions—sought to reassure private companies doing business with state-owned enterprises that their state-owned counterparts would be treated like private companies, and not like sovereigns. But the treaties were not, as Schubarth suggests, designed to go the extra step and treat all sovereign activity as commercial, thereby waiving immunity for uniquely governmental functions, like a taking.

### 3. Presence in the United States

Finally, BVVG contends that the FCN treaty's waiver provision applies only to entities with "an actual presence" in the United States. Third Mot. Dismiss at 12. Because the Court has already concluded that the treaty is not retroactive and a governmental taking does not fit the waiver provision's mold in any event, it is comfortable placing this issue to the side for now. Nor, at present, need the Court decide the related question whether BVVG's stipulation that it engaged "in commercial activity *in* the United States," Joint Stip. at 1 (emphasis added), is equivalent to an admission that it "engage[d] in commercial . . . activities *within*" the U.S., as the treaty requires, FCN Treaty, Art. XVIII ¶ 2 (emphasis added); see also Gallaher v. United States, 271 F. App'x 946 (11th Cir. 2008) (Though "[s]ubject matter jurisdiction cannot be waived or

conferred on a court by consent of the parties," they "may stipulate to facts that bear on [the] jurisdictional inquiry." (cleaned up)).

Still, one last point bears making.  Largely as a result of BVVG's litigation tactics, the record is not clear on whether it has ever had a physical presence in the U.S., either directly or through agents.  In 2020, when the Court deemed jurisdictional discovery warranted, it directed the parties to "include [] questions" about the waiver exception in their discovery proposal "[t]o the extent the[y] believe[d] the Court [would] need to resolve additional factual questions in determining whether the [] exception applies."  Schubarth III, 2020 WL 13065292 at *13 n.18.  According to Schubarth's counsel, "[a]t no time" during the "two-year period" for discovery did counsel for BVVG suggest that discovery about its presence in the U.S. would be required.  Bravin Decl. ¶ 2.  In fact, BVVG objected on relevance grounds to discovery requests about the identity and location of any BVVG employees, agents, and property in the U.S.  Bravin Decl., Ex. A (objections to Requests 2, 10, and 32).  And even now, BVVG is conspicuously cryptic in its briefing on the issue, representing only that it has no "establishment" in the United States, whatever that may mean.  See Third Mot. Dismiss at 13 ("BVVG has no establishment in the United States . . . ."); Third Reply at 17 ("It is undeniable that BVVG has no establishment in the United States . . . .").

Though BVVG is lucky that it cannot waive subject matter jurisdiction, it is luckier still that the Court may not—as a sanction for this behavior—find it had a physical presence in the U.S.  See Insur. Corp. of Ireland, LTD. V. Compagnie des Bauxites de Guinee, 456 U.S. 694, 701–02 (1982).  Otherwise, that would be a fitting sanction for BVVG's apparent sandbagging.  And, should the exercise of the Court's jurisdiction somehow come down to whether BVVG has a physical presence in the U.S. (and the Court determines BVVG has not already stipulated to

that fact), the Court will allow Schubarth to serve appropriate interrogatories on that question and expects a prompt response from BVVG.

## IV.  Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that [77] Defendants' Motion to Dismiss is DENIED in part and GRANTED in part.  It is further

**ORDERED** that BVVG shall file an answer or motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) by April 11, 2024.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>March 28, 2024</u>